IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF | § | |
| THE EXTRADITION OF | § | No. 3:26-MJ-215-BW |
| ISSAREEPORN LARKSUKTOM | § | |
| a/k/a Issareeporn Sweeney | § | |

### MEMORANDUM OPINION AND ORDER

On March 6, 2026, the government presented a complaint seeking the extradition of Issareeporn Larksuktom based on a request by the Kingdom of Thailand to answer criminal charges there.  (Dkt. No. 1.)  The government filed its brief in support of extradition on May 5.  (Dkt. No. 28 ("Govt. Br.").)  Larksuktom filed a brief in opposition of extradition on May 18.  (Dkt. No. 30 ("Resp.").)  The government filed a reply on June 1.  (Dkt. No. 32 ("Reply").)

The Court conducted a hearing on June 18.  (*See* Dkt. No. 35.)  After considering the extradition materials, the parties' arguments, and relevant authority, the Court stated in open court its findings and conclusions and certified that Ms. Larksuktom may be extradited to Thailand pursuant to the Kingdom's request presented to the United States government.  The Court enters this memorandum opinion to memorialize and supplement the findings and conclusions and, after reconsideration, to explain its decision rescinding Larksuktom's release on bail.

### I.  BACKGROUND

The government has submitted several materials in support of its complaint in extradition.  Among them is a declaration from Tom Heinemann, an attorney-

-1-

adviser at the Department of State, who attests to the relevant extradition treaty between the United States and Thailand, the Kingdom's request for Larksuktom's extradition, and the fact that the charges brought against her are extraditable offenses under the treaty.  (Dkt. No. 1 at 15-16.)[1]  The government also submitted the extradition materials sent by Thailand, which include a photograph of Larksuktom (*id.* at 37), a summary of the facts supporting Thailand's charges against her (*id.* at 39), an English translation of the relevant laws underlying her prosecution (*id.* at 42), and copies of the warrants for her arrest (*id.* at 44-54).

In further support of the extradition request, Thailand submitted an affidavit from Intranee Sumawong, a Senior Public Prosecutor in the International Affairs Department, Office of the Attorney General of Thailand.  (*See id.* at 56.)  The prosecutor testifies that the Prakanong Provincial Court of Thailand has issued two warrants for Larksuktom—one based on her own conduct and the other based on the conduct of an accomplice—both charging her with violating § 8 of the Offences of Officials in State Organizations or Agencies Act, B.E. 2502 (1959).  (*Id.* at 57 ¶ 5.) That law provides criminal penalties for "any person who, being an official in charge of purchasing, making, managing, or keeping any thing, dishonestly exercises his official duty and thereby causes damage to an organization[.]"  (*Id.*; *see also id.* at 42.)

---

[1] The Court cites the government's complaint and supporting documents (Dkt. No. 1) by citing the blue page number at the top of each page assigned by the ECF filing system.

The prosecutor's affidavit summarizes the facts underlying Larksuktom's prosecution.  He attests that the evidence includes "documents and evidence gathered from the police and financial analysis compiled by [Larksuktom's] employer, statements from [her] former colleagues including both subordinates and superiors, and statements by her customers and a co-conspirator."  (*Id.* at 57-58.)  An overview of the factual summary drawn from that affidavit follows.

Beginning in 1994, Larksuktom was employed by Krungthai Bank Public Company Limited ("KTB"), which was at all relevant times a state-owned enterprise licensed by the Thai Ministry of Finance.  As an employee of KTB, Larksuktom was a state official.  She worked in a department that transferred funds between KTB and banking institutions in Saudi Arabia for use by Thai nationals on pilgrimage there. (Dkt. No. 1 at 58-59 ¶¶ 8-12.)[2]  Customers, such as tour operators, submitted funds to KTB plus the bank's fee, and KTB created drafts authorizing the customer to receive those funds in Saudi Arabia.  (*Id.* at 58-59 ¶¶ 9-10.)  Larksuktom was a "long-time high-ranking and trusted" employee of KTB.  (*Id.* at 59 ¶ 12.)  Under her standard practices, she would follow one of three routines to facilitate the drafts and transfers:

---

[2] By way of background, the prosecutor explained that the Thai Ministry of Culture, which oversees the Department of Religious Affairs, was established to administer the practice of religions other than Buddhism.  (*See* Dkt. No. 1 at 58 ¶ 9.)  One of its responsibilities is to prevent the exploitation of Thai Muslims who travel to Saudi Arabia as part of their Hajj pilgrimage obligations.  (*Id.*)  It does this by strictly regulating tour operators licensed to take Thai nationals on Hajj and banking institutions (like KTB) that faciltated payments necessary for travel to and in Saudi Arabia.  (*Id.*)

1.      she personally collected money from tour operators at their offices, delivered the funds to KTB, and had another staff member issue a bank draft (*id.* ¶ 12(a));

2.      she directed a tour operator to sign a cash withdrawal, which another staff member used to withdraw cash from the operator's account, and then issued a draft following the usual process (*id.* ¶ 12(b)); or

3.      when Larksuktom knew precisely the amount needed for a draft, such as when it was based on standardized fees, she instructed staff to advance a bank draft for the tour operator's use and later collected the money necessary to cover the amount of that draft (*id.* ¶ 12(c)).

Investigators later learned of a fourth process employed by Larksuktom. On occasion, she instructed tour operators to deposit funds into her personal bank account or an account belonging to a close relative, then she would withdraw the money and pass it on to bank staff to create the draft. (*Id.* at 59-60 ¶ 13.)

In November 2008, a tour operator encountered issues cashing its bank draft and reported the matter to the Department of Religious Affairs, which then notified KTB. (Dkt. No. 1 at 60 ¶ 16.) KTB conducted an internal review and later confronted Larksuktom. According to the affidavit, the bank "tried to negotiate with [her] to reimburse the funds, which 1) she acknowledged and 2) she started to reimburse." (*Id.*)

The prosecutor further states that the investigation showed that KTB records prior to 2008 did not reveal any discrepancies between funds taken in and funds disbursed through drafts. (*See id.* at 60 ¶ 14 ("As part of the investigation, bank and law enforcement authorities learned that prior to 2008, Larksuktom was able to account for all the money owed to KTB for the issuance of the bank drafts[.]").) But,

-4-

from about October 2008 to December 2008, there were drafts drawn on KTB that were not reimbursed. (*Id.*) During this time, according to the affidavit, "Larksuktom fraudulently issued or directed to be issued 278 bank drafts for tour operators" without payments having been deposited into KTB "even though the tour operators paid Larksuktom what they believed were payments to KTB." (*Id.*) The missing payments totaled more than $2.1 million dollars. (*Id.*)[3] A review of personal banking records showed that Larksuktom deposited approximately $276,000 into her bank accounts around this time, and she deposited approximately $445,000 into accounts belonging to Laddawan Jamroensup ("Laddawan"), her alleged co-conspirator. (*Id.*) During November 2008, Laddawan transferred about $246,000 into Larksuktom's account. (*Id.* at 62 ¶ 22.) Laddawan told investigators that she used to be a teacher at a school attended by Larksuktom's son. (*Id.*) She also stated that she encountered financial difficulties and that Larksuktom loaned her about $14,000 to help her open a hair salon. (*Id.*)

Investigators determined that Larksuktom authorized the advance issuance of bank drafts without having received the corresponding reimbursements by instructing subordinates to fill out and sign withdrawal forms in advance, saying the process would be "too rushed otherwise." (*Id.* at 60 ¶ 15.) When a tour operator would contact Larksuktom to obtain a bank draft, she would use the pre-signed forms to

---

[3] The prosecutor's affidavit states amounts of money in Thai currency, in most instances with an equivalent in U.S. dollars using a standard exchange rate. The Court refers only to the U.S. dollar equivalents. (*See, e.g.*, Dkt. No. 1 at 60 ¶ 14.)

withdraw the funds, and then other staff would, at her direction, issue the bank drafts without confirming that the funds were paid to KTB or that Larksuktom gave the drafts to the tour operator. (*Id.*)

The second warrant arises out of events on November 14, 2008. The prosecutor's affidavit states that Larksuktom instructed subordinates to process more than $800,000 in transfers to the Thai Haj Delegation by canceling seven previously ordered bank drafts and using KTB's cash instead. (Dkt. No. 1 at 61 ¶ 18.) She told staff that the Department of Religious Affairs had an urgent need to send the money and that a Department official would arrive later that day to deliver a cashier's check to cover the transfers. (*Id.*) Staff processed the transfers based on Larksuktom's statements about the urgency of the situation and the promised repayment. (*Id.*)

At the close of business, however, bank staff noticed that no Department official had come to provide the reimbursement. (*Id.* at 61 ¶ 19.) After the bank closed, though, Laddawan arrived and presented a personal check payable to KTB and signed by her. (*Id.* at 61-62 ¶ 19.) Larksuktom represented that Laddawan was an official from the Department of Religious Affairs. (*Id.* at 61 ¶ 19.) Bank staff, however, found it odd that she presented a personal check, not one issued by the Department of Religious affairs. (*Id.* at 62 ¶ 20.) When KTB attempted to cash the check, it was rejected because the account was closed. (*Id.*) Laddawan later told investigators that, in November 2008, Larksuktom asked to borrow a check from her to present to KTB. (*Id.* at 62 ¶ 22.) She provided Larksuktom a check made out to

-6-

"cash," but Larksuktom returned the following day and asked her to change it to "KTB" and instructed her on the amount to put on the check.  (*Id.*)

When confronted by KTB, Larksuktom said she would repay the money.  (*Id.* at 62 ¶ 21.)   Larksuktom was suspended from her position on December 11, 2008.  (Dkt. No. 1 at 61 ¶ 16.)  With her brother's help, she was able to repay the amounts relating to 278 bank drafts, approximately $76,000.  (*Id.* at 60-61 ¶ 16.)  With her sister's help, Larksuktom and Laddawan repaid about one-quarter of the $800,000 arising out of the November 14 events.  (*Id.* at 62 ¶ 21.)

Larksuktom departed Thailand for the United States on January 23, 2009.  (*Id.*)  A court issued the two warrants for her arrest on March 11, 2009.  (Dkt. No. 1 at 57 ¶ 5.)  Authorities arrested Laddawan later that month.  (*Id.* at 62 ¶ 22.)  Laddawan was convicted, sentenced to five years and four months imprisonment, and ordered to pay restitution.  (*Id.*)

## II.  LEGAL STANDARDS

"Extradition is the 'surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other' for prosecution or punishment."  *Matter of Extradition of Guardado*, No. 3:24-MJ-06-1, 2024 WL 5037017, at *1 (S.D. Tex. Nov. 19, 2024) (quoting *Terlinden v. Ames*, 184 U.S. 270, 289 (1902)).  Extradition proceedings are *sui generis*, neither criminal nor civil in nature.  *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 744 (S.D. Tex. 2013).  Because extradition is primarily a function of the executive branch, courts have a limited role in the process.  *In re*

*Extradition of Risner*, No. 3:18-MJ-765-BN, 2019 WL 6118377, at \*4 (N.D. Tex. Nov. 18, 2019).

The statutory authorization for extradition is found at 18 U.S.C. § 3184. The Fifth Circuit has outlined its procedures this way:

> The substantive right of a foreign country to request the return of a fugitive and the duty of the United States to deliver the fugitive depends entirely on the existence of a treaty between the requesting nation and the United States. To invoke its right to extradite a fugitive, the requesting nation must submit its request to a state or federal court. The court determines whether the fugitive is subject to extradition and, if so, must order the fugitive's commitment and certify the supporting record to the Secretary of State. The decision to surrender the fugitive then rests in the discretion of the Secretary of State.

*In re United States*, 713 F.2d 105, 107–08 (5th Cir. 1983) (citations and footnotes omitted). As this suggests, the Court's role in extradition proceedings is primarily limited to determining whether the person is subject to extradition and whether they should be detained pending that decision. The Secretary of State ultimately makes the decision whether the person is extradited.

To certify that a person may be extradited, a court must find that the following requirements have been met: (1) the presiding judicial officer has jurisdiction to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive named in the extradition request; (3) the applicable extradition treaty is in full force and effect; (4) the extradition treaty covers the offense for which extradition is sought; and (5) there is sufficient evidence to support a finding that the fugitive committed the offense for which extradition is requested. *See* 18 U.S.C. § 3184; *Guardado*, 2024 WL 5037017, at \*2. A determination of the person's guilt or

-8-

innocence is not part of the assessment of extraditability, *Matter of Extradition of Ismail*, No. 4:24-MJ-656-BP, 2025 WL 1043630, at *5 (N.D. Tex. Apr. 8, 2025) (citing *Collins v. Loisel*, 259 U.S. 309, 314-15 (1922)), nor is it generally the court's role to scrutinize the fairness of the requesting country's legal system, *see United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

The probable cause standard applied when assessing eligibility for extradition is the "familiar standard the Court applies to domestic criminal proceedings under the Fourth Amendment." *Matter of Extradition of Campbell*, No. 3:25-MJ-218-BW, 2025 WL 1725315 (N.D. Tex. June 19, 2025), at *3 (citing *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 828 (S.D. Tex. 2011); *United States v. Ramnath*, 533 F. Supp. 2d 662, 679 (E.D. Tex. 2008)); *see also In re Extradition of Skaftouros*, 643 F. Supp. 2d 535, 542 (S.D.N.Y. 2009). Probable cause is considerably less than proof beyond a reasonable doubt. *In re Extradition of Diaz Medina*, 210 F. Supp. 2d 813, 817 (N.D. Tex. 2002) ("Probable cause is . . . not convincing evidence of actual guilt."). It has been described as "reasonable grounds to believe the accused committed the charged offense." *Garcia*, 825 F. Supp. 2d at 828. "In making this determination, courts apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime." *Id.* (quoting *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006)); *see Skaftouros*, 643 F. Supp. 2d at 542 ("[C]ourts apply a

'totality of the circumstances analysis' and use a 'flexible, common-sense standard.'"

(quoting *Illinois v. Gates*, 462 U.S. 213, 238-40 (1983))).

### III. DISCUSSION

**A.    The Court certifies Larksuktom's eligibility for extradition to Thailand.**

The government has established each of the requirements necessary for the Court to certify that Larksuktom may be extradited to Thailand.  Larksuktom concedes that (1) this Court has jurisdiction to conduct the extradition proceedings, (2) the Court has jurisdiction over her, (3) she is the person who is the subject of the extradition request, and (4) there is an extradition treaty in full force and effect between the United States and Thailand.  (Resp. at 2.)[4]  The only matter in genuine dispute is whether the materials submitted by Thailand establish probable cause to believe Larksuktom committed the offenses for which her extradition is sought.

The Kingdom of Thailand has charged Larksuktom with violations of § 8 of the Offenses of Officials in State Organizations or Agencies Act, B.E. 2502 (1959). (Dkt. No. 1 at 55 ¶ 4.)  That statute penalizes "[a]ny person who, being an official in charge of purchasing, making, managing or keeping any thing, dishonestly exercises his official duty and thereby causes damage to an organization, a limited company, a juristic-person partnership or any agency called by any other name[.]"  (*Id.* at 42.)

---

[4] At the hearing, Larksuktom also explained that she does not contest that the crimes for which extradition are sought is covered by the treaty.  She noted a reference in the extradition packet to a fraud charge for which the limitations period has expired and stated that she would dispute that the treaty allows her to be extradited on that charge.  Thailand, however, is not seeking extradition based on that charge.

Larksuktom first argues that the prosecutor's affidavit is insufficient alone to establish probable cause.  In her view, the affidavit provides only a conclusory summary of the investigation without supplying any of the underlying investigation materials—bank records, witness statements, and the like—to support the conclusions stated in the affidavit.  This, she contends, is insufficient because "there is no way to judge the credibility of the witnesses who made statements to the police or to account for the accuracy of the financial analysis that was compiled by [her] employer." (Resp. at 5.)

The Court disagrees that the affidavit is conclusory in its statement of relevant events and observations from the investigation.[5]  As detailed above, the prosecutor has recounted specific events based on witness and co-conspirator statements, financial analysis conducted by KTB, and investigators' observations.  These factual averments enable the Court to perform its function of assessing probable cause.  *Cf. United States v. Morton*, 46 F.4th 331, 336-38 (5th Cir. 2022) (en banc) (discussing wholly conclusory statements in the context of evaluating search warrant affidavits).  And courts have found probable cause based on affidavits by prosecutors recounting facts from the investigation.  *See, e.g.*, *Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1450–52 (9th Cir. 1987); *In re Extradition of Bowman*, No. 19MJ5089-

---

[5] Throughout the affidavit, the prosecutor uses incriminating terminology to discuss certain conduct or events.  For example, he characterizes Larksuktom as having "embezzle[d]," (Dkt. No. 1 at 58 ¶ 8), describes her conduct as "criminal" (*id.*), and states that she "fraudulently" issued drafts (*id.* at 60 ¶ 14).  The Court has ignored these characterizations, focusing instead on whether the objective facts stated establish probable cause.

JLB, 2020 WL 6689807, at *7–9 (S.D. Cal. Nov. 13, 2020); *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 944–49 (N.D. Ill. 2011); *Joseph v. Hoover*, 254 F. Supp. 2d 595, 601 (D.V.I. 2003). "Hearsay statements of witnesses summarized in the affidavit of a foreign official are admissible and may be sufficient to support a finding of probable cause." *In re Extradition of Blakeney*, No. 10-MJ-635 SMG, 2010 WL 4457778, at *3 (E.D.N.Y. Nov. 1, 2010); *see also Vargas*, 978 F. Supp. 2d at 747 ("[T]he Supreme Court has found that extradition may be predicated entirely on the 'unsworn statements of absent witnesses.'" (quoting *Collins*, 259 U.S. at 317)). Here, the facts recounted by the prosecutor come from information provided by Larksuktom's superiors and subordinates, Laddawan, and financial analysts, among others. The facts alleged evince sufficient indicia of reliability to support the Court's probable-cause determination.

The Court next determines whether the prosecutor's affidavit establishes probable cause. The materials provided show that, at all relevant times, KTM was a state-owned enterprise. (*See* Dkt. No. 1 at 58.) They also allege that, as an employee of KTM, Larksuktom was an official in charge of managing KTM's funds and that the bank incurred losses from a shortfall resulting from paid drafts that were not funded or reimbursed. Larksuktom does not appear to dispute that these allegations satisfy their corresponding elements of the offense charged.

Larksuktom instead aims her challenge to probable cause at facts suggesting that the loss or misapplication of bank funds resulted from criminal conduct as opposed to mismanagement. (*See* Resp. at 4-6.) She also asserts that there is

insufficient evidence to establish that the loss resulted from her exercise of official duties. (*See id.* at 6.) The Court disagrees on both points.

The affidavit provides details that enable the Court to find probable cause that Larksuktom acted dishonestly or criminally. The senior prosecutor testifies in his affidavit that, prior to 2008, KTB's drafts were fully funded. (Dkt. No. 1 at 60 ¶ 14.) That changed, however, in October 2008. (*See id.*) From about October to December 2008, Larksuktom authorized numerous bank drafts for tour operators without reimbursing the bank although the tour operators submitted funds to Larksuktom. (*Id.*) Bank records show that, in October and November 2008, Larksuktom deposited an amount equivalent to approximately $275,000 into her bank accounts and approximately $445,000 into accounts owned by Laddawan. (*Id.*) In November 2008, Laddawan transferred about $246,000 to Larksuktom. (Dkt. No. 1 at 62 ¶ 22.) This temporal alignment between the unfunded drafts and Larksuktom's large deposits into personal accounts enables an inference that Larksuktom diverted money intended for KTB's use. And, in the absence of any explanation why a bank official would deposit such large amounts of money intended for the bank's use into personal accounts, the deposits strongly suggest that the diversion was done by deliberate dishonesty rather than being the product of inadvertence, mistake, or occupational incompetence.[6]

---

[6] Larksuktom points to the prosecutor's statement that Larksuktom occasionally collected funds, deposited them into her bank account or accounts belonging to close relatives, and then reimbursed the bank. (*See* Dkt. No. 1 at 59-60 ¶ 13.) This does not

According to the prosecutor's affidavit, once the bank discovered Larksuktom's "misconduct," confronted her, and attempted to negotiate reimbursement of the funds, she "acknowledged" the funds and made efforts to repay them.  The Court accepts Larksuktom's assertion that the affidavit stops short of alleging that she admitted guilt or criminal culpability.  But acknowledging the missing funds and undertaking an obligation to repay them suggests some acceptance of responsibility for the missing funds, even if it does not involve the acceptance of criminal responsibility.  That is, Larksuktom did not dispute that a large amount of bank funds was unaccounted for or that she had responsibility for them.

The prosecutor further states that, on November 18, 2008, Larksuktom, using claims of urgency, directed subordinates to process transfers equivalent to more than $800,000 to a Saudi bank by canceling previously ordered drafts and using KTB's cash instead.  (Dkt. No. 1 at 61 ¶ 18.)  She secured the cooperation of subordinates by saying that an official from the Department of Religious Affairs would arrive later that day and bring a cashier's check to reimburse those transfers.  (*Id.*)  Instead, Laddawan—whom Larksuktom falsely represented was an officer of the Department of Religious Affairs—arrived after hours and presented a personal check.  (Dkt. No. 1 at 61-62 ¶ 19.)  That check was later declined because the account it was drawn on had been closed.  (Dkt. No. 1 at 62 ¶ 20.)  After Laddawan's arrest, Laddawan stated

---

undermine the Court's finding of probable cause.  There is nothing suggesting that the bank was aware of or blessed that process—rather, KTB and investigators learned of it during the investigation.  (*Id.*)  This practice still supports an inference of dishonesty, even though these instances did not violate the charged statute because they did not result in damage to KTB.

that Larksuktom asked to borrow a check to present to KTB, directing her with respect to the identity of the payee and the amount. (*Id.* ¶ 22.) Laddawan was convicted for her part in the scheme. (*Id.*)

Finally, after having been made aware of the investigation and making an incomplete attempt to repay the funds, Larksuktom left Thailand. Her departure to a foreign country under these circumstances with no apparent plans to return enables the Court to find that she fled the country to avoid the possibility of prosecution. Her flight further supports an inference of guilty knowledge. *See, e.g.*, *United States v. Henry*, 119 F.4th 429, 435 (5th Cir. 2024) ("[E]vidence of an accused's flight is generally admissible as tending to establish his guilt." (quoting *United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir. 1985))).

These facts, considered in their totality, support an inference that the loss of bank funds resulted from Larksuktom's "dishonest[] exercise[]" of her official duties. The prosecutor's affidavit provides facts from which one may infer that Larksuktom diverted funds equivalent to hundreds of thousands of dollars to personal accounts belonging to her and Laddawan and that Laddawan then transferred much of that money to Larksuktom. Larksuktom instructed subordinates at the bank to fund transfers outside of normal procedures by using false representations that an official would present a check to reimburse those transfers. Then she presented Laddawan as that government official. When confronted, Larksuktom acknowledged some responsibility or the missing funds and later fled the country.

Having determined that the government's showing satisfies each of the requirements for extradition, the Court **CERTIFIES** that Larksuktom may be extradited to the Kingdom of Thailand to answer charges there.

**B.     Having certified Larksuktom for extradition, the Court is not authorized to continue her on conditional release.**

After a bail hearing on April 17, the Court found that Larksuktom established her releasability by clear and convincing evidence and additionally showed exceptional circumstances warranting release during these extradition proceedings. (*See* Dkt. No. 25.)  The Court authorized Larksuktom's release on conditions that included a home curfew and electronic monitoring.  (*See* Dkt. No. 27.)  No allegation has been made that she has violated any of the conditions imposed.

After concluding at the June 18 hearing that the government established Larksuktom's eligibility for extradition, the Court revoked her release and ordered that she be taken into custody.  In doing so, the Court expressed agreement with the government's argument that it is not authorized to release a person on bail once the certification of extraditability has been made.  (*See* Reply at 8-12.)  The controlling statutory language, under this view, is the portion of § 3184 providing that, once a person is certified as extraditable, the judicial officer "shall issue his warrant for the commitment of the person so charged to the proper jail, *there to remain* until such surrender shall be made."  18 U.S.C. § 3184 (emphasis added).

This language in § 3184 speaks in mandatory terms with respect to post-certification detention.  There is no provision for confinement "if" or "unless"

-16-

certain circumstances are present.  Other courts—including some that ultimately reach a different conclusion with respect to the court's authority—have read the statute as requiring detention once a certification for extradition has been made.  *See, e.g.*, *Matter of Extradition of Manrique*, No. 19MJ71055MAG1TSH, 2021 WL 5037680, at *1 (N.D. Cal. Oct. 29, 2021) (observing that § 3184 "seems clear enough: the word 'shall' is usually mandatory, and 'there to remain' sounds like the person has to stay in jail"); *Matter of the Extradition of Markey*, No. 3:09-MJ-75 CAN, 2010 WL 610975, at *4 (N.D. Ind. Feb. 18, 2010) (saying of § 3184 that "[t]he law is clear, and the parties agree, that this Court has no authority to release Markey after it issues the certificate of extraditability").  Indeed, the Supreme Court has read the same text as "inconsistent with . . . allow[ing bail] after committal."  *Wright v. Henkel*, 190 U.S. 40, 62 (1902).  Even so, this Court received the parties' arguments on the issue of bail at the hearing and promised to reconsider its conclusion while preparing this written opinion.  Having done so, the Court reaches the same conclusion.

The Court first addresses two aspects of Larksuktom's arguments for post-certification bail.  One relies on 18 U.S.C. § 3188, a statute that enables a person detained while awaiting extradition to apply for discretionary release if the government has not removed them within two months.[7]  According to Larksuktom,

---

[7] § 3188:

> Whenever any person who is committed for rendition to a foreign government to remain until delivered up in pursuance to a requisition, is not so delivered up and conveyed out of the United States within two calendar months after such commitment, over and above the time actually required to convey

the possibility of release under § 3188 corroborates that post-certification detention is not mandatory in all circumstances. But allowing for discretionary release when extradition takes too long does not imply that the post-certification detention mandated by § 3184 is discretionary from the outset. *See Manrique*, 2021 WL 5037680, at *1 ("[F]rom the statute's plain language, it seems that at least the first two months of custody are mandatory, but there is a safety valve if the government takes too long to actually accomplish the extradition.").

A second argument for post-certification release relies on the sheer volume of caselaw rejecting the government's position. *See, e.g.*, *Risner v. Fowler*, 458 F. Supp. 3d 495, 499 (N.D. Tex. 2020) (citing cases and relying on "the weight of authority holding that a district court has authority to release a fugitive after certification"); *Matter of Extradition of Blasko*, No. 117MC00067DADSAB, 2019 WL 498986 (E.D. Cal. Feb. 8, 2019); *In re Kapoor*, No. 11-M-456 RML, 2012 WL 2374195 (E.D.N.Y. June 22, 2012); *Wroclawski v. United States*, 634 F. Supp. 2d 1003 (D. Ariz. 2009). Indeed, the jurisprudence on this issue has been accurately described as a "slew of lower court decisions holding that bail is permitted in extradition cases post-certification." *Manrique*, 2021 WL 5037680, at *2. The Fifth Circuit has not spoken

---

the prisoner from the jail to which he was committed, by the readiest way, out of the United States, any judge of the United States, or of any State, upon application made to him by or on behalf of the person so committed, and upon proof made to him that reasonable notice of the intention to make such application has been given to the Secretary of State, may order the person so committed to be discharged out of custody, unless sufficient cause is shown to such judge why such discharge ought not to be ordered.

-18-

on this issue, however, and these lower court decisions do not bind this Court, even if they collectively comprise a "slew."  And, to the extent they embrace the majority position merely because it is held by a majority, the Court declines to follow suit. *See, e.g.*, *Nezirovic*, 990 F. Supp. 2d at 598-99 (relying on "the plain weight of authority" to conclude that a court may release an extraditee after certification); *Wroclawski*, 634 F. Supp. 2d at 1005 (finding persuasive three appellate decisions discussed *infra* note 8 and "the myriad district court cases").[8]

After more thoughtfully considering the issue, the Court remains firm in its conclusion that § 3184's mandate for detention controls in this circumstance.  The Court declines to follow the majority position otherwise because it is premised on a

---

[8] Some courts justify the availability of post-certification bail by pointing to three appellate court decisions. *See, e.g.*, *Manrique*, 2021 WL 5037680, at *3 (citing *Salerno v. United States*, 878 F.2d 317, 317–18 (9th Cir. 1989) (quorum); *Beaulieu v. Hartigan*, 554 F.2d 1, 1–2 (1st Cir. 1977) (per curiam); and *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981)); *Wroclawski*, 634 F. Supp. 2d at 1005 (same).  This Court discerns no guidance from these appellate decisions.  Two of them are exceedingly brief opinions that affirm a district court's *denial* of release post certification.  *See Salerno*, 878 F.2d at 317–18; *Beaulieu*, 554 F.2d at 1–2.  They do not analyze the availability *vel non* of post-certification release.  They appear instead to have assumed the availability of release but affirmed district courts' decisions to deny bail under the traditional pre-certification standards.  The Second Circuit, in *Hu Yau-Leung*, was primarily focused on whether a person who was a juvenile at the time of the offense could be extradited, addressing releasability in the two concluding paragraphs. *See Hu Yau-Leung*, 649 F.2d at 916–20.  There, a district court granted a writ of habeas corpus after a magistrate certified that a person was subject to extradition.  *See id.* at 915. After concluding that the district court erred by granting the writ, the Second Circuit expressed agreement with the government's position that release during extradition proceedings "is a more demanding standard than that for ordinary accused criminals awaiting trial" but determined that the district court had correctly applied the proper standards in releasing the subject.  *Id.* at 920.  The court's agreement with the government that "the standard for release . . . is a more demanding standard" suggests that, like in *Salerno* and *Beaulieu*, the Second Circuit considered whether post-certification bail was properly granted assuming those standards applied.  It did not—and was not asked to— consider whether bail was altogether unavailable.

fundamental misunderstanding of the Supreme Court's seminal decision in *Wright v. Henkel*, 190 U.S. 40 (1903), which involved a court's authority to grant release in extradition proceedings *prior to* certification.  There, an American citizen held on a request for extradition to England sought bail based on his physician's affidavit attesting to diagnoses and conditions that threatened to seriously impair the man's health if he remained in jail.  *See id.* at 40, 43.  A commissioner—a forerunner of the contemporary magistrate judge—denied that request "on the ground that no power existed for admitting petitioner to bail[.]"  *Id.* at 43.

The Supreme Court disagreed that the absence of statutory authority to grant bail meant there was none.  *See id.* at 62–63.  In reaching that conclusion, it considered an English decision that "held that the Queen's Bench had, 'independently of statute, by the common law, jurisdiction to admit to bail,'" in a case involving the rendition of fugitives between different parts of the kingdom.  *Id.* at 63 (quoting *Queen v. Spilsbury* [1898], 2 Q. B. 615)).  Based on this reading of English common law, the Supreme Court expressed an "unwilling[ness] to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute[.]"  *Id.*  That is, the Supreme Court recognized a court has authority to grant release in extradition proceedings notwithstanding the absence of any express statutory authority to do so.

Again, *Wright* was a pre-certification case.  Courts that use *Wright* to find bail authority post certification do so based on a belief that the Supreme Court said its

holding applies to both pre- and post-certification contexts.  *See, e.g.*, *Manrique*, 2021 WL 5037680, at *2 ("[T]he government tries to distinguish *Wright* by arguing that it was a pre-certification case, which it was, but the Supreme Court itself rejected that distinction."); *Garcia v. Benov*, No. CV 08-07719 MMM CWX, 2009 WL 6498194, at *5 (C.D. Cal. Apr. 13, 2009) (concluding that "*Wright* drew no analytical distinction between pre- and post-certification bail applications").  This Court disagrees that *Wright* supports such a belief.

A closer examination of *Wright* demonstrates that it did not grant courts license to ignore a statute's mandate for detention when it applies.  Courts that consider *Wright* equally controlling in the pre- and post-certification context do so based on its reference to a then-existing statute that mirrored § 3184 in prohibiting post-certification bail:

> Not only is there no statute providing for admission to bail in cases of foreign extradition, but § 5270 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 3591), is inconsistent with its allowance after committal, for it is there provided that, if he finds the evidence sufficient, the commissioner or judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

*Wright*, 190 U.S. at 62.  A couple of paragraphs later, the Court, while explaining the importance of honoring treaty obligations, remarked that "the same reasons which induced the language used in [§ 5270] would seem generally applicable to release pending examination."  *Id.* at 62.  Based on this one sentence, courts read *Wright* as holding that the inherent authority for release is the same before and after

certification, regardless the terms of any statute.  For example, one court draws this meaning from *Wright* based on its reference to § 5270:

> The Court specifically cited the language that seemed to prohibit post-certification bail and said "the same reasons" that induced that "language used in the statute would seem generally applicable to release pending examination."  The Court did not think those situations were different. It would seem, therefore, that *Wright* stands for the proposition that both pre- and post-certification, the availability of bail is not limited to what is "specifically vested by statute."

*Manrique*, 2021 WL 5037680, at *2 (citations omitted); *see also Kapoor*, 2012 WL 2374195, at *3 (relying on the reference in *Wright* as "[m]ost important" to the court's decision); *Benov*, 2009 WL 6498194, at *5 n.23 (concluding that *Wright* "applied the same statutory language").  Contrary to that proposition discerned from *Wright*, the Supreme Court did not identify an inherent power to grant bail that prevails over a statute stating otherwise.

Recognizing a court's authority to grant bail in the absence of an empowering statute is far different from bestowing authority to grant bail where a statute prohibits it.  *Wright* did the former, not the latter.  It held that a court has a common law authority to grant release even though the "same reasons" animating Congress's decision to eliminate that power in § 5270 are "generally applicable" in the pre-certification context.  *See Wright*, 190 U.S. at 62.  That is, the Supreme Court in *Wright* accepted that policy reasons for disallowing release at the post-certification stage generally apply equally prior to certification.  But the Court did not consider these policy reasons in isolation—i.e., in the absence of a statutory prohibition—to preclude a court's inherent power to grant bail.  That is, the Supreme Court

expressed its unwillingness to say a court's authority is limited to what is "specifically vested by statute." *Wright*, 190 U.S. at 62.  It did not hold that a court continues to possess authority to grant release even when it has been specifically *divested* by statute.

For these reasons, the Court is unable to follow the majority in concluding that, after having certified Larksuktom for extradition, it can continue her bail based on the special circumstances previously found.  To do so would contravene § 3184.

## IV.  CONCLUSION

The Court **CERTIFIES** that Issareeporn Larksuktom a/k/a Issareeporn Sweeney is extraditable to Thailand and **DENIES** her request for continuation on bail post-certification.

No later than **June 30, 2026**, the government shall submit to the undersigned's orders inbox—copying Larksuktom's counsel—a proposed extradition certification and order of commitment.  Once that is done, the Court will order the Clerk of Court to forward certified copies of this Memorandum Opinion and Order, the Certification of Extradition, and the Order of Commitment, together with a copy of all the testimony and evidence taken before the Court and all memoranda of law filed on the issue of extradition, to the Secretary of State, Department of State, to the attention of the Office of Legal Adviser.

Ms. Larksuktom is remanded to the custody of the United States Marshal and shall remain confined in a proper facility until surrender is made to a duly qualified

agent of the Kingdom of Thailand or until further order of this Court or direction

from the Secretary of State.

**SO ORDERED** on June 22, 2026.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE